**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-02302-STV

BRIAN WATSON,

      Plaintiff,

v.

LAURA ELSADEN,

      Defendant.

_____

**ORDER**
_____

Chief Magistrate Judge Scott T. Varholak

This matter comes before the Court on Defendant's Motion for Summary Judgment (the "Motion") [#73]. The parties have consented to proceed before a United States Magistrate Judge for all proceedings, including entry of a final judgment. [## 15, 17] This Court has carefully considered the Motion and related briefings, the case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motion. For the following reasons, the Court respectfully **GRANTS IN PART** and **DENIES IN PART** the Motion.

**I.     BACKGROUND**

This defamation action arises from statements Defendant allegedly made at a private gathering on July 5, 2024, that Plaintiff was "a criminal" and that Plaintiff had "relations" with prostitutes and frequented prostitutes. [*See generally* #58] Plaintiff initiated this action on August 20, 2024. [#1] On October 21, 2024, Defendant moved to

dismiss under Rule 12(b)(6), arguing that: (1) information subject to judicial notice established Plaintiff was a Public Figure at the time of the alleged statements, (2) the alleged statements concerning criminality constituted matters of public concern, and (3) Plaintiff failed to plead actual malice.  [#19]  On May 20, 2025, the Court held a hearing on the Motion to Dismiss, denying the Motion without prejudice and allowing Defendant to file an early Summary Judgment Motion solely on the issue of whether Plaintiff was a Public Figure.  [#48]  On December 8, 2025, Defendant filed the instant Motion seeking summary judgment on the limited issue of whether Plaintiff was a public figure for purposes of this defamation action at the time of the alleged defamatory statements, July 5, 2024.  [*See* #73]  Plaintiff has responded [#80] and Defendant replied [#81].

## II.     UNDISPUTED MATERIAL FACTS[1]

Plaintiff is the founder and chief executive officer of W.D.C. Holdings, LLC, doing business as Northstar Commercial Partners (“Northstar”).  [#81-1 at ¶ 1]  Plaintiff has described Northstar as one of the largest commercial real estate, development, investment, and asset-management companies in Colorado, with assets located in 17 states.  [*Id*. at ¶ 2]  Plaintiff has referred to Northstar as an “empire,” and in 2020 the company reported approximately $1.3 billion in assets across 17 states.  [*Id*. at ¶ 6-7]  In a 2019 podcast introduction, Watson was described as the founder and chief executive officer of Northstar, a long-time entrepreneur, author, and seasoned politician.  [*Id*. at ¶ 8]

---

[1] Consistent with D.C.COLO.LCivR 56.1(1), the Motion includes a statement of proposed undisputed facts in sequentially numbered paragraphs.  [#73-1]  The following facts are undisputed unless otherwise noted.

Plaintiff also engaged in public philanthropic and community activities. He founded the Brian Watson Foundation and the Opportunity Coalition and served in leadership roles for those organizations. [*Id*. at ¶ 10] The Opportunity Coalition maintained a YouTube channel containing more than 400 videos with approximately 49,693 views, most of which featured Plaintiff. [*Id*. at ¶ 12] Videos associated with Plaintiff's program, Mountains of Opportunity, remain publicly accessible online. [*Id*. at ¶ 13] The program is described as highlighting entrepreneurs and innovators throughout Colorado while airing on major news networks across the state, including Fox, CNN, CNBC, ESPN, and HLN. [*Id*.]

Plaintiff twice sought elective office. He ran for the Colorado House of Representatives in 2012 and later for Colorado Treasurer in 2018. [*Id*. at ¶¶ 16, 20] Plaintiff described his 2012 legislative race as one of the most highly contested races in Colorado and among the top 50 races nationwide. [*Id*. at ¶ 17] In 2018, Plaintiff won the Republican primary for Colorado Treasurer and ultimately received more than one million votes in the general election. [*Id*. at ¶ 20] Both of Plaintiff's campaigns for office were unsuccessful. [*Id*. at ¶¶ 74-75]

Plaintiff also authored two books. In 2017, he self-published *The 7 Rings*, which discusses, among other things, his views concerning leadership, politics, philanthropy, and public engagement. [*Id*. at ¶¶ 25-28] Plaintiff promoted the book publicly and self-printed between four and five thousand copies, which remain available for purchase through Amazon and Barnes & Noble. [*Id*. at ¶¶ 26, 30-31] Plaintiff self-published a second book, *Building: Lessons Learned in Life and Real Estate*, in 2019. [*Id*. at ¶ 32] Northstar promoted the book through a press release entitled "20 Thoughts on 2020," in which Plaintiff encouraged members of the public to read the book and offered

complimentary copies.  [*Id*. at ¶ 33]  In January 2020, Forbes included that book on a list of recommended books, which Plaintiff publicly promoted.  [*Id*. at ¶¶ 34-35]

Beginning in approximately 2014, Plaintiff regularly appeared in public-facing media roles.  In 2014, Northstar publicized an interview of Plaintiff conducted by Donald Trump Jr. that was scheduled to air on Fox Business Network and Bloomberg Television.  [*Id*. at ¶ 3]  In 2016, Plaintiff appeared as a guest commentator on CNN Headline News and Fox News.  [*Id*. at ¶¶ 4-5]  Plaintiff later engaged publicly through media appearances and publications in early 2020, appearing on multiple podcasts, authoring several articles for Forbes, and publicly commenting on public-policy issues.  [*Id*. at ¶¶ 24, 37]

Various online materials concerning Plaintiff remain publicly accessible. A YouTube page entitled "Brian Watson" contains videos featuring Watson, interviews, and commentary.  [*Id*. at ¶ 38]  A Wikipedia page concerning Watson likewise remains publicly available and summarizes his business career, political campaigns, and subsequent investigations and litigation.  [*Id*. at ¶ 39]

The parties do not dispute that Plaintiff substantially reduced his public activities after 2020.  Plaintiff has not appeared as a guest or commentator on a podcast, news program, or entertainment program since March 2020.  [*Id*. at ¶ 60]  Nor is it disputed that Plaintiff has not run for political office since 2018, that the Opportunity Coalition's YouTube channel has not uploaded new public content since 2019, that the YouTube page entitled "Brian Watson" has not uploaded a new video since May 2015, and that Plaintiff's personal website is no longer active.  [*Id*. at ¶¶ 70-73]

In April 2020, the FBI searched Plaintiff's residence, which received widespread publicity and significantly affected his public reputation.  [*Id*. at ¶ 41]  The search was

4

covered by at least five separate news articles reporting that the court-authorized search concerned allegations that Plaintiff participated in a "significant fraud and kickback" scheme involving Amazon land acquisitions. [*Id*. at ¶¶ 42-43] According to those reports, the allegations involved claims that Plaintiff and others bribed Amazon employees to obtain confidential information regarding planned land purchases. [*Id*. at ¶ 43] In a sworn declaration executed on July 18, 2025, in separate litigation, Plaintiff stated that the FBI raid "set[] into motion a series of events that ultimately destroyed [his] reputation throughout Colorado and the United States." [*Id*. at ¶ 41]

The public attention surrounding Plaintiff continued through multiple high-profile civil proceedings. In 2020, Amazon filed suit against Plaintiff in the Eastern District of Virginia. [*Id*. at ¶ 44] In 2022, the SEC separately sued Plaintiff, alleging securities fraud in connection with Northstar and asserting that he misled investors by representing that he was personally investing in certain projects. [*Id*. at ¶ 45] Separately, the Department of Justice later vacated guilty pleas obtained in connection with the alleged Amazon kickback scheme, and Plaintiff—who was never criminally charged—publicly praised that decision through a statement provided by counsel to The Washington Post, calling it "courageous" and "honorable." [*Id*. at ¶ 47]

Plaintiff also publicly discussed the impact of these events. On April 2, 2020, he sent an email entitled "Last Words" to more than 30 recipients, including an FBI agent involved in the search, stating that the FBI investigation, among other events, had left him with "no choice but to end [his] life" and expressing concern that his "name [would] be tarnished." [*Id*. at ¶ 48] That email subsequently received media coverage. [*Id*. at ¶ 49] More than four years later, on July 20, 2024, Plaintiff sent another broadly distributed

email to a large number of recipients discussing the FBI search and related litigation, stating that others had "destroyed [his] name [and] reputation" and announcing his intention to pursue "significant financial restitution" against those he believed responsible. [*Id*. at ¶ 50]

Plaintiff has likewise gained public attention regarding these events through litigation and related publicity.  The instant lawsuit, filed in August 2024, received coverage in The Denver Post.  [*Id*. at ¶ 51]  Following the filing of this and related lawsuits, Plaintiff's counsel issued multiple press releases describing him as a "prominent businessman" and asserting that the federal investigation, civil litigation, and FBI raid resulted from "a series of lies."  [*Id*. at ¶¶ 52, 54-55]  His complaints in both this action and a separate lawsuit against Amazon allege that his "name" and "reputation" were "destroyed" and characterize his downfall as one of Denver's top business stories in 2020. [*Id*. at ¶¶ 54, 56-57]  News coverage likewise continued into late 2024, including reports in the Denver Business Journal concerning Plaintiff's litigation.  [*Id*. at ¶ 53]

## III.   STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994).  "[T]he summary-judgment burden slightly differs depending on which party bears the ultimate burden at trial."  *Stewart v. Am. Fam. Mut. Ins. Co., S.I.*, 744 F. Supp. 3d 1198, 1200 (D. Colo. 2024).  "A movant that does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant must only point the Court to

a lack of evidence for the other party on an essential element of that party's claim." *Id.* (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). "Once this movant has met its initial burden, the burden then shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "But 'if the moving party has the burden of proof [at trial], a more stringent summary judgment standard applies.'" Id. (quoting *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008)). "A moving party who bears the burden at trial 'must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case.'" *Id.* (quoting *Pelt*, 539 F.3d at 1280).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson*, 477 U.S. at 249). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury. *See Anderson*, 477 U.S. at 248-49; *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987). Evidence, including testimony, offered in support of or in opposition to a motion for summary judgment "must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable juror could return a verdict for either party. *Anderson*, 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

7

'genuine issue for trial.'"  *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  In reviewing a motion for summary judgment, the Court "view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party."  *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002).

## IV.   ANALYSIS

Plaintiff asserts a defamation claim under Colorado law.   [#58 at ¶¶ 71-78] Generally, the elements of defamation in Colorado are: "(1) a defamatory statement concerning another; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication."  *McIntyre v. Jones*, 194 P.3d 519, 523-24 (Colo. App. 2008) (quoting *Williams v. Dist. Court*, 866 P.2d 908, 911 n.4 (Colo. 1993)).  "Because the threat of protracted litigation could have a chilling effect upon constitutionally protected rights of free speech, prompt resolution of defamation actions, by summary judgment . . . is appropriate."  *Barnett v. Denver Pub. Co.*, 36 P.3d 145, 147 (Colo. App. 2001).

In any defamation suit, substantial truth is an absolute defense to defamation.  *Fry v. Lee*, 408 P.3d 843, 848 (Colo. App. 2013) (collecting cases).  "A defendant asserting truth as a defense . . . is not required to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting, of the matter is true."  *Id.* at 849 (quotation omitted).  "[T]he question is whether 'there is a substantial difference between the allegedly libelous statement and the truth; or, stated differently whether the statement produces a different effect upon the reader than that which would be produced by the

8

literal truth of the matter.'" *SG Interests I, Ltd. v. Kolbenschlag*, 452 P.3d 1, 6 (Colo. App. 2019) (quoting *Gomba v. McLaughlin*, 180 Colo. 232, 236 (1972)). "This inquiry focuses on an 'average reader' and asks whether 'the challenged statement produces a different effect upon the [average] reader than that which would be produced by the literal truth of the matter.'" *Id.* (quoting *Fry*, 408 P.3d at 849). Generally, the defendants bear the burden of showing substantial truth to establish the affirmative defense. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1110 (10th Cir. 2017) (applying Colorado law).

Where a public figure is involved, however, a heightened burden applies. *Barnett*, 36 P.3d at 147; *see also Brokers' Choice,* 861 F.3d at 1110. In such circumstances, the plaintiff is required to prove the statement's falsity by clear and convincing evidence. *Barnett*, 36 P.3d at 147. "This heightened burden requires a plaintiff to demonstrate that the statement was made with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was true or false." *Id*. "Actual malice can be shown if the author entertained serious doubts as to the truth of the statement or acted with a high degree of awareness of its probable falsity." *Id*.

The Supreme Court has recognized two categories of public figures. Some individuals achieve such pervasive fame or notoriety with "such persuasive power and influence" that they become public figures for all purposes and in all contexts. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). Others become public figures only for a limited range of issues by voluntarily injecting themselves into a particular public controversy. *Id*. at 351-52. Whether a plaintiff is a public figure is a question of law for

9

the Court.  *Schwartz v. Am. Coll. of Emergency Physicians*, 215 F.3d 1140, 1145 (10th Cir. 2000)

Defendant argues that Plaintiff was, as a matter of law, an all-purpose public figure and, alternatively, a limited-purpose public figure at the time Defendant allegedly made the challenged statements.  [#73 at 14-20]  The Court addresses each argument in turn.

## A.    All-Purpose Public Figure

The category of all-purpose public figures is a narrow one.  It encompasses those individuals who possess such "pervasive fame or notoriety" that they are public figures regardless of the subject matter of the alleged defamation.  *Gertz*, 418 U.S. at 351-52. Few people belong to "that small group of individuals who are public figures for all purposes."  *Wolston v. Reader's Dig. Ass'n, Inc.*, 443 U.S. 157, 165 (1979).  Reviewing courts must not "lightly assume that a citizen's participation in community and professional affairs will render[] him a public figure for all purposes."  *Gertz*, 418 U.S. at 352.  "Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life."  *Id*.

The Court recognizes that determining whether one is an all-purpose public figure is often a difficult task. Some cases present an easy answer. Courts have readily recognized all-purpose public-figure status where a plaintiff's notoriety is so pervasive that virtually any aspect of his or her life is a matter of legitimate public concern.  *See, e.g., Carson v. Allied News Co.*, 529 F.2d 206, 209-10 (7th Cir. 1976) (holding that nationally recognized entertainer Johnny Carson was a public figure).  Other cases fall much closer to the line.  *Gertz* itself illustrates the difficulty.  Although plaintiff Elmer Gertz

10

had authored books, served in leadership positions in professional organizations, and was well known in some circles, the Supreme Court nevertheless concluded that he had not achieved the "general fame or notoriety" necessary to become a public figure for all purposes. *Gertz*, 418 U.S. at 351-52.

Plaintiff's circumstances are more akin to the latter type of case. The undisputed record establishes that he was a highly successful businessman, a statewide political candidate, an author, media personality,[2] and philanthropist who cultivated some public attention over many years. [#81-1 at ¶ 1, 3-5, 10, 13, 16, 20] Those accomplishments made Plaintiff well known, particularly within Colorado's business and political communities. Nevertheless, the Court is not persuaded that this record demonstrates the sort of pervasive, generalized notoriety contemplated by *Gertz*. While Plaintiff was undoubtedly prominent, prominence alone is not synonymous with the celebrity-like or ubiquitous public stature that renders virtually every aspect of an individual's life a matter of public concern, "for all purposes and in all contexts." *Gertz*, 418 U.S. at 351. On this record, Defendant has not established as a matter of law that Plaintiff belonged to that

---

[2] Describing Plaintiff as a "media personality" may be overstating his media influence. The evidence before the Court is that Plaintiff: (1) was a "guest commentator" on CNN once and on Fox news once, though the Court does not know how long he appeared on these shows or whether those particular programs had high ratings [#81-1 at ¶¶ 4-5]; (2) interviewed Donald Trump, Jr. which was scheduled to air on Fox Business Network and Bloomberg News, though it is unclear whether it ever did so air [*id.* at ¶ 3]; (3) has appeared on the Opportunity Coalition's YouTube videos that have received under 50,000 total views, by an unknown total number of individual viewers [*id.* at ¶ 12]; (4) has his own YouTube page with an unknown number of subscribers [*id.* at ¶ 38]; (5) has appeared on at least four podcasts with an unknown number of subscribers or listeners [*id.* at ¶¶ 8, 24]; and (6) has written four articles for Forbes with an unknown number of readers [*id.* at ¶¶ 24, 37].

exceedingly narrow class of all-purpose public figures.[3]  *Shanley v. Hutchings*, 716 F.

Supp. 3d 1179, 1190 (D. Utah. 2024) (rejecting claim that author who had published a

---

[3] Even if Plaintiff's prior public prominence could support a finding that he was once an all-purpose public figure, that would not necessarily end the inquiry.  Plaintiff correctly observes that the Supreme Court has not squarely addressed whether an individual who was once an all-purpose public figure may, with the passage of time, lose that status. [*See* #80 at 6-7]  Defendant argues in reply that "*every* circuit court to address the issue" has concluded that the passage of time does not alter an individual's public-figure status. [#81 at 2, 9 (emphasis in original) (citing *Partington v. Bugliosi*, 56 F.3d 1147, 1152 n.8 (9th Cir. 1995) and *Shoen v. Shoen*, 292 P.3d 1224, 1230 n.5 (Colo. App., 2012))]  But Defendant overstates both footnotes. The Ninth Circuit expressly limited its observation to limited-purpose public figures, explaining that "it appears that every court of appeals that has specifically decided this question has concluded that the passage of time does not alter an individual's status as a *limited-purpose public figure*."  *Id*. (emphasis added) (collecting cases).  The Colorado Appeals Court likewise discusses this issue as related to limited purpose public figures. *See Shoen*, 292 P.3d at 1230 n.5.  Those authorities do not address whether an individual who was once an *all-purpose public figure* may, with the passage of time, lose that status.  The distinction is significant.  A limited-purpose public figure attains that status by voluntarily assuming a position of prominence within a particular public controversy.  *See Gertz*, 418 U.S. at 351-52.  It follows that the individual's relationship to that controversy ordinarily does not dissipate merely because time has passed.  Whether the same principle applies to the broader and considerably narrower category of all-purpose public figures presents a different question.  Although the Supreme Court has not resolved that precise question, courts' public-figure jurisprudence consistently focuses on the plaintiff's status at the time the statements were made. *See Lawrence v. Moss*, 639 F.2d 634, 638 (10th Cir. 1981) ("On the record presented, plaintiff was not a public figure *at the time* of the alleged defamatory statement." (emphasis added)); *cf. Hutchinson v. Proxmire*, 443 U.S. 111, 134-35 (1979) (rejecting the proposition that publicity arising after the alleged defamation could establish public-figure status).  Particularly given that all-purpose public figures are limited to "a small group of individuals," *Wolston*, 443 U.S. at 165, it would seem that a lapse in time may render someone who once fell into this unique class of individuals no longer so broadly known as to have the general fame and notoriety to still be a member of that class, *id.* at 170-72 (Blackmun, J., concurring).  Accordingly, had Plaintiff's pre-2020 accomplishments been sufficient to render him an all-purpose public figure at that time, the relevant inquiry may still be whether Plaintiff retained that status on July 5, 2024, when Defendant allegedly made the challenged statements.  Although Plaintiff's earlier public prominence would provide important context, the record may not demonstrate that he possessed the pervasive fame or notoriety required for all-purpose public-figure status as of July 2024.  Ultimately, however, the Court need not resolve the issue of whether an all-purpose public figure can lose that status because, for the reasons detailed above, the record does not demonstrate that Plaintiff ever retained all-purpose public figure status.

number of books was an all-purpose public figure because "[n]o matter how many books [the plaintiff] has published, hers is not a household name"); *Barrett v. Atl. Monthly Grp., LLC*, No. 22-49 (LLA), 2024 WL 4119400, at *15 (D.D.C. Sept. 9, 2024) (rejecting claim that a journalist was an all-purpose public figure because while members of the media sometimes achieve that status, there was "[n]othing in the record currently before the court [to] suggest[ ] that [the plaintiff] is a well-known celebrity whose name is [a] household word comparable to" those media members who had been treated as all-purpose public figures (quotation omitted)); *Mazur v. Szporer*, No. Civ.A. 03-00042(HHK), 2004 WL 1944849, at *4 (D.D.C. June 1, 2004) (the plaintiff, a successful businessman with ownership interests in a number of businesses in the United States and elsewhere, who was also a leader in a number of social and community-based activities, was not an all-purpose public figure); *Pages v. Feingold*, 928 F. Supp. 148, 150 (D.P.R. 1996) (the plaintiff, a successful businessman whose business success had brought him recognition within business and commercial circles, was not a public figure, let alone an all-purpose public figure), *aff'd*, 114 F.3d 1169 (1st Cir. 1997).

### B.    Limited-Purpose Public Figure

The Court next considers Defendant's alternative argument that Plaintiff was a limited-purpose public figure.  [#73 at 18-20]  Unlike all-purpose public-figure status, limited-purpose public-figure status is issue specific.  A person becomes a limited-purpose public figure by voluntarily injecting himself or herself into a particular public controversy in an effort to influence its outcome.  *Gertz*, 418 U.S. at 351-52.  In making such a determination, the Court must: 1) identify the relevant public controversy; 2) determine whether Plaintiff voluntarily assumed a position of prominence within that

13

controversy; and 3) decide whether the allegedly defamatory statements are germane to the plaintiff's participation in that controversy. *See id.* at 352; *Quigley v. Rosenthal*, 43 F.Supp.2d 1163, 1176 (D.Colo.1999).

"A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980). Moreover, the controversy must exist before the allegedly defamatory publication; a defendant cannot create a public controversy by making the allegedly defamatory statement itself. *See Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 14 (1st Cir. 2011) ("[T]he controversy must predate the alleged defamation") (collecting cases); *see also Hutchinson*, 443 U.S. at 135 ("[T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.").

With these principles in mind, the Court first identifies the relevant public controversy. Here, the undisputed record demonstrates a preexisting public controversy concerning Northstar Commercial Partners, the widely publicized FBI investigation, the ensuing SEC and civil litigation, allegations of fraud relating to Amazon land acquisitions, and Plaintiff's role in those events. [#81-1 at ¶¶ 43-45] Those matters generated extensive public attention years before the July 5, 2024 statements and continued to do so thereafter. [*Id.* at ¶¶ 41-43, 47]

The Court next turns to Plaintiff's role in the controversy. Mere public attention does not render an individual a public figure. *See Wolston*, 443 U.S. at 167 ("A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention."). Here, by contrast, Plaintiff

14

affirmatively participated in the public debate surrounding these events.  Following the 2020 FBI search, Plaintiff publicly responded to the allegations through statements to the media, publicly-distributed communications, and litigation-related press releases.  [#81-1 at ¶¶ 47-56]  Specifically, in April 2020, Plaintiff sent an email to a large number of recipients, including an FBI agent involved in the search, expressing suicidal thoughts stemming from the "massive negative impacts" of COVID-19, legal issues, and the "FBI witch hunt."  [*Id*. at ¶ 48]  The email was subsequently reported by the media.  [*Id*. at ¶ 49]  In January 2024, Plaintiff provided a public statement through counsel to *The Washington Post* praising the Department of Justice's decision to vacate guilty pleas connected to the Amazon investigation.  [*Id*. at ¶ 47; #73-36]  Following the date of the alleged defamatory statements, Plaintiff continued to publicly discuss the FBI search and its aftermath.  On July 20, 2024, Plaintiff sent a widely distributed email addressing the FBI search, the related litigation, and his intention to seek restitution from those he believed had destroyed his reputation.  [#81-1 at ¶ 50]  In late 2024, after filing this action and pursuing litigation related to the FBI search, Plaintiff's counsel issued multiple press releases publicly disputing the allegations and characterizing Plaintiff as the victim of false accusations.  [*Id*. at ¶¶ 52, 55-56]

These actions constituted voluntary efforts to influence public understanding of an ongoing controversy that had already generated widespread public attention. By continuing to engage publicly with the media and through public statements concerning the litigation and investigations, Plaintiff voluntarily assumed a position of prominence within that controversy.  *See Gertz*, 418 U.S. at 345 ("[T]hose classed as public figures

15

have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.").

The remaining question is whether the allegedly defamatory statements were germane to that controversy. The Court first addresses Defendant's alleged statement calling Plaintiff "a criminal." [#58 at ¶ 33] The Court concludes that this statement is sufficiently related to the public controversy. Defendant does not merely allege generalized criminal conduct untethered to Plaintiff's public activities. Rather, a reasonable listener could understand Defendant's alleged statement that Plaintiff was "a criminal" as referring to Plaintiff's alleged involvement in the publicly reported investigations and litigation arising from Northstar's business practices. The record demonstrates that those issues were central to the preexisting public controversy in which Plaintiff voluntarily participated. Accordingly, the alleged "criminal" statement is sufficiently germane to that controversy to render Plaintiff a limited-purpose public figure with respect to that statement.

The Court reaches a different conclusion regarding Defendant's alleged statement that Plaintiff had "relations" with prostitutes. [*Id*. at ¶ 36] Defendant has identified no evidence that Plaintiff voluntarily injected himself into any public controversy concerning his alleged sexual conduct or that such allegations formed part of the preexisting controversy surrounding Northstar, the FBI investigation, or the related litigation. Although allegations concerning a person's sexual conduct may be newsworthy, newsworthiness alone does not establish a public controversy for purposes of the limited-purpose public-figure doctrine. *Waldbaum*, 627 F.2d at 1296. Because Defendant has not demonstrated that the alleged statement concerning Plaintiff's involvement with

16

prostitutes was germane to the controversy in which Plaintiff voluntarily participated, Defendant has not established as a matter of law that Plaintiff was a limited-purpose public figure with respect to that statement.

The Court therefore concludes that Plaintiff was a limited-purpose public figure only with respect to the alleged "criminal" statement concerning the public controversy surrounding Northstar and the resulting investigations and litigation.  Defendant has not demonstrated that Plaintiff was a limited-purpose public figure regarding the alleged statement concerning Plaintiff's purported relations with prostitutes.

## V.    CONCLUSION

For the foregoing reasons, the Motion [#73] is **GRANTED IN PART.** The Court finds that Plaintiff is a limited-purpose public figure with respect to Defendant's alleged "criminal" statement and therefore Plaintiff must plead and prove actual malice as to that statement. The Motion is otherwise **DENIED.**  Plaintiff is not a public figure with respect to Defendant's statements regarding Plaintiff's alleged involvement with prostitutes. The Court further finds that Plaintiff is not an all-purpose public figure.

DATED: July 20, 2026                                   BY THE COURT:

                                                                      s/Scott T. Varholak
                                                                      United States Magistrate Judge

17